# Illinois Official Reports

## Appellate Court

---

**People v. Encalado, 2017 IL App (1st) 142548**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THEOPHIL ENCALADO, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-2548 |
| Filed | February 14, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-4270; the Hon. Matthew E. Coghlan, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Caitlin M. Valiulis, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion.<br>Justice Pierce concurred in the judgment and opinion.<br>Justice Mason concurred in part and dissented in part, with opinion. |

¶ 1    A jury found Theophil Encalado guilty on three counts of aggravated criminal sexual assault. In this appeal, we find that the trial court did not abuse its discretion when it permitted the prosecution to impeach Encalado's testimony by showing that he had a prior conviction for predatory criminal sexual assault. However, we find that the trial court abused its discretion when it refused to ask venire members questions about potential bias against persons who participate in prostitution. Accordingly, we reverse the convictions and remand for a new trial.

¶ 2                                    BACKGROUND

¶ 3    Around 7 a.m. on March 5, 2006, Deputy Fernando Rodriguez of the Cook County sheriff's department brought Y.C. to St. Elizabeth's Hospital, where Y.C. told medical personnel that she had been raped and punched in the face. A doctor collected oral, vaginal, and anal swabs for testing. In 2008, tests showed that DNA in the fluid on the vaginal swab matched Encalado's DNA. Prosecutors charged Encalado with three counts of aggravated criminal sexual assault in that he threatened Y.C. with a weapon and forced contact between (1) his penis and her mouth, (2) his penis and her vagina, and (3) his penis and her anus.

¶ 4    Before the jury trial, the prosecution filed a motion for leave to present evidence that Encalado had committed similar sexual assaults against C.C., S.A., and J.H., a minor. The trial court held the crime against J.H. too dissimilar, but it permitted the State to present evidence of the assaults against C.C. and S.A. The court separately ruled that if Encalado chose to testify, the prosecution could impeach him with evidence that he was convicted of predatory criminal sexual assault for the offense committed against J.H.

¶ 5    The prosecutor filed a motion *in limine* based on the rape shield statute (725 ILCS 5/115-7(a) (West 2004)), asking the court to bar any evidence of prior sexual contact between Encalado and Y.C. Encalado did not object, and the trial court granted the motion. The prosecutor also asked the court to bar evidence that the anal swab of Y.C. held the semen of Y.C.'s boyfriend and not the semen of Encalado. Again, Encalado did not object, and the court granted the motion. Encalado's attorneys adhered to the rape shield rulings, as they offered no evidence concerning the anal swab and any prior sexual contact between Y.C. and Encalado.

¶ 6    Encalado informed the court that he intended to testify that Y.C., as well as C.C. and S.A., consented to the sexual contact in exchange for the payment of cash and drugs, but after they delivered the agreed services, he decided to take back the payments he made. He asked the court to question the venire as to whether they could evaluate the evidence of assault without bias if they knew Encalado had narcotics with him at the time of the alleged offenses. He also asked the court to say to the venire, "you will hear evidence about prostitution. Would that fact alone prevent you from being fair to either side?" The court refused to ask the venire any questions relating to drugs or prostitution.

¶ 7    Y.C. testified that around 6 a.m. on March 5, 2006, as she walked toward a bakery near her home, a man she did not recognize leaned out of a car and said to her, "yo, your cousin Jose, he was looking for you." Y.C., who had a cousin Jose who lived a few blocks away, went over to the car and asked what Jose wanted. The driver, Encalado, offered to take her to Jose. Y.C. asked to stop by the bakery first. Encalado said, "yeah," and she got into the car. Encalado started driving the wrong direction for going to either the bakery or Jose's home. Y.C. asked

where they were going. Encalado said, "[Y]ou know what this is." Encalado stopped in an alley. Y.C. tried to open the door but found it locked. Encalado struck Y.C. repeatedly in the face. Encalado opened the glove compartment and took out a pistol. He called Y.C. a bitch, a whore, and a slut. He unzipped his pants and pushed Y.C.'s head onto his penis. He covered Y.C.'s head with his coat, got on top of her, pulled down her pants, and penetrated her vaginally and anally. When he stopped, he pushed her out of the car and threw her shoe at her. Y.C. ran screaming until she saw Rodriguez, who brought her first to the police station and then to the hospital.

¶ 8        Rodriguez testified that he saw Y.C. in the street, trying to persuade passing cars to stop, crying hysterically, with blood on her mouth. Y.C. told him she had been raped. The nurse who saw Y.C. noted the bruise on her lip.

¶ 9        The prosecution then presented its evidence that Encalado committed a similar crime against C.C. The prosecution elected not to present evidence of the crime committed against S.A.

¶ 10       C.C. testified that on September 10, 2002, she went to a club with her sister. C.C. decided to leave the club and wait for her sister in her sister's car. As she walked down an alley, a man drove up and asked if she needed a ride. She said no and kept walking, but she did not remember correctly where her sister had parked. A few minutes later the same man drove up again and asked if she needed help. She got into his car. She then noticed that the driver wore a bandana that covered most of his face. He locked the car doors, punched C.C. in the face, and covered her face with her clothes. He forced his penis into her vagina. When he finished, he robbed her of some jewelry before driving her back to the club. C.C.'s sister took her to a nearby hospital. C.C. admitted to police that she did not see clearly the man who raped her, and she made no identification of her rapist. But swabs in the rape kit taken at the hospital held DNA that matched Encalado's DNA.

¶ 11       On cross-examination, C.C. admitted that in 2009, when she first told police about the assault, she said the rapist held a knife when he assaulted her. She explained that he held it to her neck when she got into the car, but she did not see it again after that.

¶ 12       Encalado admitted that he had sex with Y.C. and C.C., and he also admitted that he had a prior conviction for predatory criminal assault. Encalado testified that on March 5, 2006, after 5 a.m., he went to an area of Chicago known for prostitution, looking to find someone willing to trade sex for cash. He saw Y.C., and he asked if she was working. She said yes and got into his car. He asked for oral and vaginal sex in exchange for $65 and some marijuana. She agreed. He parked in an alley, and they engaged in oral and vaginal intercourse. During the vaginal intercourse, his penis came out of the vaginal canal and made contact with Y.C.'s anus. She said, "[T]oo low, wrong hole." He said, "I am sorry," but then he lost his erection and could not regain it. He testified that "like an idiot," he took back the money he had paid her. Y.C. started yelling at him, demanding the cash. He pushed her out of the car and drove off. He never punched her or said anything about a cousin Jose.

¶ 13       Encalado testified that he picked up C.C. on September 1, 2002, in another area known for prostitution. Encalado saw C.C. on the street, and she waved him to an alley. He asked if she was working, and she said yes and got into his car. He offered her $60 and told her he could get some cocaine. In exchange for the cash plus the cocaine, she agreed to have oral and vaginal sex with him. After he ejaculated, he took out of her pocket the money he had paid her. She

- 3 -

yelled at him and called him names, but she got out of the car without her payment. He did not punch her or steal her jewelry.

¶ 14    The jury found Encalado guilty on all three counts. In his motion for a new trial, Encalado again objected to the decision disallowing the questions he sought to ask the venire and the decision to permit the prosecution to use his prior conviction for predatory criminal sexual assault to impeach his testimony. The trial court denied the motion for a new trial.

¶ 15    At the sentencing hearing, the prosecution chose to present evidence of the crime against S.A. S.A. testified that around 1 a.m. on August 11, 2007, while she worked as a prostitute, Encalado drove up and waved her to his car. She got in. She told him the price for her work. He said he had only $40. She refused the proposed transaction. Encalado then punched her in the face and demanded that she pull her shirt over her eyes. He forced his penis into her mouth and her vagina. After she got out of the car, she returned to the area where she worked, and she saw Encalado across the street. She also saw some police officers. As she started to approach the officers, Encalado ran off. She told the officers about the assault. She did not tell them that she had been working as a prostitute. She explained:

> "I wanted to be taken seriously, I didn't want them to shrug it off and say, oh, it was just a prostitution gone bad, and I wanted to be treated like a human."

¶ 16    At first S.A. refused medical treatment, but after she took narcotics to calm herself down, she went to a nearby hospital where she underwent standard treatment for a criminal sexual assault victim. Two years later, police brought her to the police station to show her a lineup. She identified Encalado as the man who raped her in 2007. She also told police that she had been working as a prostitute when she got into Encalado's car.

¶ 17    The trial court sentenced Encalado to three terms of 20 years each, with the sentences to run consecutively. Encalado now appeals.

¶ 18                                          ANALYSIS

¶ 19    Encalado contends that this court should remand for a new trial because the trial court mistakenly permitted the prosecution to use his prior conviction for impeachment and because the trial court refused to question venire members about their attitudes toward prostitution and drugs.

¶ 20                                    Prior Conviction

¶ 21    The trial court has discretion to permit the prosecution to use prior convictions for impeachment of a criminal defendant. *People v. Montgomery*, 47 Ill. 2d 510, 515 (1971). This court will not reverse the trial court's judgment due to the admission into evidence of a prior conviction unless the trial court abused its discretion. *People v. Atkinson*, 186 Ill. 2d 450, 461-63 (1999). To decide whether to admit evidence of the prior crime for impeachment, the trial court should consider "the nature of the crime, nearness or remoteness of the crime, the subsequent career of the person, and whether the crime was similar to the one charged." *People v. Redd*, 135 Ill. 2d 252, 325 (1990). The court must not allow the conviction into evidence if the unfair prejudicial effect of the evidence substantially outweighs its probative value. *Montgomery*, 47 Ill. 2d at 517-18.

¶ 22    Encalado points out that the trial court did not expressly weigh the appropriate factors, and the court made no findings to support its conclusion that the probative value of the evidence

- 4 -

outweighed its unfair prejudicial effect. However, the parties brought the appropriate factors to the court's attention and argued about their application to the facts of the case. The court knew that several women had accused Encalado of criminal sexual assaults that took place between 2002 and 2007, and Encalado admitted that on several occasions he robbed women selling sex. One prior court found Encalado guilty of a predatory criminal sexual assault, with the conviction dated 2013 for conduct that occurred in 2002.

¶ 23    The case presented a credibility contest between Y.C.'s and Encalado's accounts of the encounter on March 5, 2006. The prior felony conviction could substantially aid the jury in assessing Encalado's credibility. See *Atkinson*, 186 Ill. 2d at 461-62. But "[w]here multiple convictions of various kinds can be shown, strong reasons arise for excluding those which are for the same crime because of the inevitable pressure on lay jurors to believe that 'if he did it before he probably did so this time.' As a general guide, those convictions which are for the same crime should be admitted sparingly ***." *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967).

¶ 24    We find this case effectively indistinguishable from *Redd*. Redd had a prior conviction for rape and attempted murder, and he faced new, similar charges. After a jury found him guilty of the new charges, Redd, on appeal, argued that the trial court erred when it admitted the prior convictions for impeachment and that the trial court failed to weigh explicitly the appropriate factors before deciding to admit the convictions into evidence. Our supreme court held:

> " 'Since the court was aware of *Montgomery* and its provisions, it must be assumed that the judge gave appropriate consideration to the relevant factors and they need not appear of record.' [*People v*.] *Hovanec*, 76 Ill. App. 3d [401,] 421 [(1979)].
>
> In this case, defendant argued to the circuit court that the prior rape and attempted murder convictions are so similar to the charges defendant faced at trial that defendant could not get a fair trial. The State responded that defendant's case turned on credibility; the State argued to the circuit court that 'the discretion you are given under *Montgomery* in order to know whether or not that [defendant's] conviction for the similar offense is also an aid in determining credibility and will not be reversed if in granting our motion using your discretion you allow us to use a similar offense.' The circuit court then denied the motion. From the record, it appears the trial court understood its discretion under *Montgomery*, and properly denied defendant's motion." *Redd*, 135 Ill. 2d at 326.

¶ 25    Here, too, the transcript shows that the parties brought to the court's attention the appropriate factors, and the court understood its discretion. In light of the jury's need for information relevant to Encalado's credibility, we cannot say that the trial court abused its discretion when it permitted the prosecution to use Encalado's prior conviction for predatory criminal sexual assault for impeachment. See *Redd*, 135 Ill. 2d at 326; see also *Atkinson*, 186 Ill. 2d at 461-62.

¶ 26                                           *Voir Dire*

¶ 27    Our supreme court, in *People v. Strain*, 194 Ill. 2d 467 (2000), articulated the guiding principles for appellate review of questions asked on *voir dire*:

> "[T]he trial court is given the primary responsibility of conducting the *voir dire* examination, and the extent and scope of the examination rests within its discretion.

[Citations.] However, the trial court must exercise its discretion in a manner consistent with the purpose of *voir dire*. [Citations.] As the court observed in *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993), '[t]he purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath.' [Citations.] The jurors must harbor no bias or prejudice which would prevent them from returning a verdict according to the law and evidence. [Citation.] Thus, 'a failure to permit pertinent inquiries to enable a party to ascertain whether the minds of the jurors are free from bias or prejudice which would constitute a basis of challenge for cause, or which would enable him to exercise his right of peremptory challenge intelligently, may constitute reversible error.' [*People v.*] *Lobb*, 17 Ill. 2d [287], 300 [(1959)]." *Strain*, 194 Ill. 2d at 476-77.

¶ 28     However, the trial court should not permit the parties to use *voir dire* to indoctrinate the jurors or to "ascertain prospective jurors' opinions with respect to evidence to be presented at trial." *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 17.

¶ 29     The *Strain* court held that Strain had a right to have the court question the venire to help him determine whether his membership in a street gang would prevent individuals in the venire from weighing the evidence against him without bias. *Strain*, 194 Ill. 2d at 477. Courts have also found a duty to question venire members about possible bias against drug users (*People v. Lanter*, 230 Ill. App. 3d 72, 74-76 (1992)) and the insanity defense (*People v. Stack*, 112 Ill. 2d 301, 311 (1986)) when those biases might affect the jurors' ability to decide the case impartially.

¶ 30     Encalado informed the court that he intended to introduce evidence that Y.C. and C.C. had agreed to exchange sex for money and drugs, and after they delivered the agreed services, he robbed them of the amounts he had paid them. Under *Butler*, Encalado had no right to indoctrinate the jury or ascertain their attitudes toward his defense, so he could not ask whether the venire members could weigh impartially evidence that he robbed prostitutes. See *Butler*, 2013 IL App (1st) 113606, ¶ 17; see *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 40. However, Encalado did not request that question. Instead, he asked the court to say to the venire, "you will hear evidence about prostitution. Would that fact alone prevent you from being fair to either side?"

¶ 31     Several courts have noted that some sexual behaviors can evoke from many venire members strong responses that prevent the venire members from assessing evidence without bias. Courts have noted potential juror bias against persons who exchange sex for money (*Commonwealth v. Harris*, 825 N.E.2d 58, 75 (Mass. 2005) (Marshall, C.J., concurring in part and dissenting in part, joined by Greaney, J.)), homosexuals (*In re Commitment of Hill*, 334 S.W.3d 226 (Tex. 2011); *Gavin*, 2014 IL App (1st) 122918, ¶ 41), persons who "posed nude and had sex both for money and for the purpose of making pornography" (*Wood v. Alaska*, 957 F.2d 1544, 1552 (9th Cir. 1992)), and persons engaged in sexually immoral conduct (*People v. Scaggs*, 111 Ill. App. 3d 633, 636 (1982); *People v. Liapis*, 3 Ill. App. 3d 864, 868 (1972)).

¶ 32     We find that jurors may hold similar biases against customers of women who exchange sex for money. A number of jurisdictions have used public antipathy toward patrons of prostitutes as a means of reducing prostitution:

"[T]he Pennsylvania state legislature approved an amendment to its criminal code requiring courts to publish the name and the sentence of any person twice found guilty of patronizing a prostitute.

*** [H]undreds of communities across the nation employ various methods of systematically shaming johns. The names or faces of those arrested for soliciting prostitutes may flash across local papers, scattered billboards, hand painted signs, or city-run cable television channels.

* * *

A large part of the appeal of shaming johns lies in its theoretical effectiveness. Applying punishment theories to those factors peculiar to public humiliation of prostitutes' patrons demonstrates that the chance of some measurable effect is strong.

* * *

In all likelihood, prostitutes' patrons, their immediate communities, and the surrounding public will all perceive stigmatizing publicity as painful." Courtney Guyton Persons, Note, *Sex in the Sunlight: The Effectiveness, Efficiency, Constitutionality, and Advisability of Publishing Names and Pictures of Prostitutes' Patrons*, 49 Vand. L. Rev. 1525, 1536-38 (1996).

¶ 33     A researcher found that "In the 1990s, a growing number of communities have sought to apply a new range of sanctions to punish men who buy sex, including: publicity ***. *** When confronted with the threat of a penalty more serious than a fine—*** [such as] publication of a photo—defendants resist, delay, and plead to a lesser offense to avoid the sanction." Sylvia A. Law, *Commercial Sex: Beyond Decriminalization*, 73 S. Cal. L. Rev. 523, 567-68 (2000). Another researcher found that "Customers *** are more fearful of arrest and punishment and more vulnerable than prostitutes to public shaming and stigmatization. [Citation.] A British study found that arrested customers were unconcerned about fines but very worried about damage to their reputations if their activities were made public [citation]." Ronald Weitzer, *Prostitution Control in America: Rethinking Public Policy*, 32 Crime, L. & Soc. Change 83, 96 (1999). See also Julie Lefler, Note, *Shining the Spotlight on Johns: Moving Toward Equal Treatment of Male Customers and Female Prostitutes*, 10 Hastings Women's L.J. 11 (1999). Thus, we find that legislatures and the customers of women who exchange sex for money know that many persons feel strong disgust and antipathy toward the patrons of prostitutes.

¶ 34     The State points out that Encalado accused the prosecution's witnesses of working as prostitutes so that the venire members may have held biases against the State's witnesses. The question Encalado sought to ask the venire would also have helped probe for any potential bias against the two witnesses accused of engaging in commercial affections. The fact that the prosecution had an interest in a jury free from bias against prostitutes does not excuse the trial court's failure to probe for such potential bias. We find that Encalado requested an appropriate question during *voir dire* to help him determine whether the potential jurors could weigh the evidence against him, without a predisposition to find him guilty of criminal sexual assault because he patronized prostitutes. The trial court's *voir dire* questions failed to reveal whether any members of the venire harbored a bias against persons who participate in prostitution, and therefore Encalado could not "ascertain whether the minds of the jurors are free from bias or prejudice which would constitute a basis of challenge for cause, or which would enable him to exercise his right of peremptory challenge intelligently." *Lobb*, 17 Ill. 2d at 300.

¶ 35    The dissent argues that the trial court applied the policy behind the rape shield law when it refused to ask the questions Encalado sought on *voir dire*. See *infra* ¶¶ 48-67. The parties and the court recognized that Encalado had a constitutional right to present evidence directly bearing on his defense that Y.C. agreed to have sex with him in exchange for money and drugs. See *People v. Hill*, 289 Ill. App. 3d 859, 862 (1997). The rape shield law expressly requires courts to permit defendants "to offer certain evidence which [is] directly relevant to matters at issue in the case, notwithstanding that it concern[s] the victim's prior sexual activity." *People v. Santos*, 211 Ill. 2d 395, 405-06 (2004).

¶ 36    Thus, the court knew it could not preclude Encalado from testifying that Y.C. agreed to have sex with him in exchange for money. The dissent acknowledges that jurors may harbor biases against persons who engage in acts of prostitution. The trial court here, knowing about the evidence Encalado intended to present and the widespread bias against both prostitutes and their customers, needed to decide what to do about the potential effect of Encalado's expected testimony on the rights of the parties to a fair trial.

¶ 37    The judge chose the course that gave the parties no opportunity to discover whether any members of the venire could weigh the evidence impartially once Encalado testified. The judge's choice led to a high likelihood that some persons serving on the jury would react with strong disgust and antipathy toward Encalado when he testified that he patronized prostitutes.

¶ 38    The dissent states as grounds for affirmance that the evidence in this credibility contest "was, by any measure, overwhelming," (*infra* ¶ 66) and that Encalado's "preposterous" testimony was a "transparent ploy" (*infra* ¶¶ 56, 67). The dissent appears to suggest that the trial court should assess the credibility of the defendant's testimony, and if the court finds the defendant not credible, the court need not bother with impaneling an impartial jury. We hold that the trial court must protect the defendant's constitutional right to have an impartial jury and not assess the credibility of his testimony. See *Strain*, 194 Ill. 2d at 476-77.

¶ 39    The rape shield statute only prescribes rules for the admissibility of evidence. The statute does not prescribe the rules for conducting *voir dire*. The statute does not give any party the right to a trial by a biased jury. The statute does not give any party a right to prevent another party from discovering whether potential jurors harbor biases that could affect the right to trial by an impartial jury.

¶ 40    The rape shield statute protects the integrity of trials by requiring courts to exclude certain kinds of highly prejudicial evidence of little relevance that could lead juries to base their verdicts on emotional reactions rather than an honest appraisal of the evidence. *State v. Budis*, 593 A.2d 784, 788-89 (N.J. 1991); *People v. Williams*, 614 N.E.2d 730, 733 (N.Y. 1993); see also *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 22. However, the rape shield statute does not tell the court how to maintain the integrity of the trial and protect the parties' rights to trial by an impartial jury when the court must allow a party to introduce highly prejudicial evidence. When the court must allow the evidence, *Strain* provides guidance for the protection of the right to an impartial jury.

¶ 41    We recognize that even if the court asked the question Encalado sought to ask the venire, venire members biased against prostitutes and their patrons may have served on the jury. *Voir dire* does not perfectly exclude biased jurors, especially because venire members may lie in their answers on *voir dire*. See *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). Nonetheless, questioning on *voir dire* provides a means for the parties to attempt to discover biases that could affect the parties' right to a fair trial. See *Strain*, 194 Ill.

2d at 476-77. The procedure used by the trial court here, and defended by the dissent, removed the possibility of discovering whether a venire member held a widespread bias that would affect his or her ability to weigh the evidence impartially.

¶ 42 Moreover, if a woman who works as a prostitute, like S.A., accuses a man of injuring her in a sexual assault, she may want to exclude from the jury deciding the case any venire members biased against her because of her source of income, persons who may "decide the case on an improper or emotional basis." *State v. Hudlow*, 659 P.2d 514, 521 (Wash. 1983) (*en banc*). S.A., for one, knew that if she told police she worked as a prostitute, they would treat her complaint of an assault as insignificant, as they would see her as less than human. The dissent would stand as precedent for disallowing any questioning of the venire about attitudes toward prostitution. Fortunately, a woman like S.A. will have this case, instead, to rely on to help her get a fair trial.

¶ 43 Because the trial court erred when it refused to ask an appropriate question during *voir dire*, which would have tested an area of potential bias not covered by other questions, we must reverse the convictions and remand for a new trial. See *Lanter*, 230 Ill. App. 3d at 76. On remand, if Encalado requests *voir dire* questions concerning possible bias due to his drug possession, the court should allow appropriate questions on the issue. See *Lanter*, 230 Ill. App. 3d at 75-76.

¶ 44                              CONCLUSION

¶ 45 The trial court did not abuse its discretion when it decided that the prosecution could use Encalado's prior conviction for predatory criminal sexual assault for impeachment in this prosecution for aggravated criminal sexual assault. The trial court abused its discretion when it refused to ask the venire members whether hearing evidence of prostitution would affect their ability to assess the evidence impartially. Accordingly, we reverse the convictions and remand for a new trial.

¶ 46 Reversed and remanded.

¶ 47 JUSTICE MASON, concurring in part and dissenting in part.

¶ 48 I concur in the majority's conclusion that the trial court properly admitted evidence of Encalado's prior conviction for predatory criminal sexual assault. But I disagree that the trial court abused its discretion in refusing to permit Encalado to question prospective jurors during *voir dire* regarding whether evidence of prostitution would prevent them from being fair or that the refusal "thwarted the selection of an impartial jury." *People v. Williams*, 164 Ill. 2d 1, 16 (1994) (superseded on other grounds by rule as stated in *People v. Garstecki*, 234 Ill. 2d 430, 438 (2009)). Under the circumstances here, the rape shield statute (725 ILCS 5/115-7(a) (West 2004)), and the strong public policy it reflects, precludes a finding that the trial court abused its discretion by refusing to allow the defense to introduce the issue of prostitution into jury selection. Therefore, I respectfully dissent from the majority's decision to reverse Encalado's conviction on this ground.

¶ 49 Encalado admitted he had sex with both the victim and the corroborating witness. He could hardly do otherwise as his DNA was recovered from both victims. He claimed, however, that

on both occasions, the women were prostitutes, the sex was consensual, and they only complained afterward because Encalado took back the money he paid them.

¶ 50    Prior to trial, the State filed a motion *in limine* to preclude Encalado from introducing evidence of the victim's prior sexual history or from attempting to impeach the corroborating witness with a conviction for prostitution. Although no order granting the motion is in the record, I must assume the motion was granted since no questions along those lines were asked on cross-examination of either witness. Thus, prior to jury selection, Encalado was aware that he could not introduce evidence of either the victim's or the corroborating witness's sexual history.

¶ 51    Notwithstanding Encalado's recognition that the trial court properly limited the scope of his cross-examination of both the victim and the corroborating witness, Encalado complains that he should have been permitted to propound the following question to prospective jurors: "You will hear evidence about prostitution. Would that fact alone prevent you from being fair to either side?" He further argues that refusal to propound that single question to members of the venire deprived him of his right to a fair trial.

¶ 52    Our supreme court has long recognized that "the primary responsibility for both initiating and conducting the *voir dire* examination lies with the circuit court, and the manner and scope of that examination rests within the discretion of that court." *Williams*, 164 Ill. 2d at 16; *People v. Terrell*, 185 Ill. 2d 467, 484 (1998). There is no "bright-line" test for determining the propriety of *voir dire* questioning; rather, the scope of permissible questions

> "is a continuum. Broad questions are generally permissible. For example, the State may ask potential jurors whether they would be disinclined to convict a defendant based on circumstantial evidence. See *People v. Freeman*, 60 Ill. App. 3d 794, 799-800 (1978). Specific questions tailored to the facts of the case and intended to serve as 'preliminary final argument' (*People v. Mapp*, 283 Ill. App. 3d 979, 989-90 (1996)) are generally impermissible." *People v. Rinehart*, 2012 IL 111719, ¶ 17.

See also *People v. Howard*, 147 Ill. 2d 103, 135-36 (1991) (no error in trial court's refusal, in defendant's prosecution for crimes committed with a firearm, to ask prospective jurors about their attitudes toward guns).

¶ 53    The purpose of *voir dire* is not to explore prospective jurors' opinions with respect to evidence that will be presented at trial. *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 17. "[I]t is not the purpose of *voir dire* to preview the evidence for the jury, or to measure the jurors' reactions to certain facts." *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 44 (citing *Butler*, 2013 IL App (1st) 113606, ¶ 17). "Further, to be constitutionally compelled, it is not enough that a *voir dire* question be helpful; rather, the trial court's failure to ask the question must render the defendant['s] proceedings fundamentally unfair." *Butler*, 2013 IL App (1st) 113606, ¶ 15 (citing *Terrell*, 185 Ill. 2d at 485).

¶ 54    In this case, measured against Encalado's right to conduct *voir dire* is the protection afforded victims and corroborating witnesses under the rape shield statute. 725 ILCS 5/115-7 (West 2004). Under the statute, in a prosecution for, *inter alia*, criminal sexual assault and aggravated criminal sexual assault, the prior sexual activity or the reputation of the alleged victim or corroborating witness is inadmissible except (1) to show that the victim's or corroborating witness's past sexual conduct *with the accused* bears on the issue of consent to the conduct charged or (2) "when constitutionally required to be admitted." 725 ILCS 5/115-7(a) (West 2004). The statutory prohibition of inquiry into a victim's or corroborating

witness's sexual past includes the victim's alleged profession as a prostitute. *People v. Ivory*, 139 Ill. App. 3d 448, 453 (1985).

¶ 55    Our supreme court has recognized that in "extraordinary circumstances," a defendant's constitutional right of confrontation through cross-examination may take precedence over the protections of the statute. *People v. Sandoval*, 135 Ill. 2d 159, 185 (1990) (cross-examination of sexual assault victim regarding prior sexual history potentially permissible when relevant (1) to show bias, interest, or motive for making false charge; (2) to explain physical facts such as presence of semen, pregnancy, or evidence of sexual intercourse; or (3) to demonstrate victim's prior conduct clearly similar to conduct in issue). But Encalado does not claim that his right of confrontation was violated by his inability to cross-examine Y.C. regarding his assertion that she was a prostitute or that this case presented any of the "extraordinary circumstances" recognized in *Sandoval*. Indeed, defense counsel never even asked Y.C. (or the corroborating witness) if she consented to have sex with his client, which, given Encalado's defense, he would have been entitled to do. It stands to reason, therefore, that because Encalado claims no error in the court's ruling on the State's motion *in limine* based on the rape shield statute, there was likewise no error in precluding him from questioning prospective jurors about whether evidence of prostitution would prevent them from fairly judging the case.

¶ 56    In essence, Encalado claims that his trial was rendered "fundamentally unfair" because the trial court refused to allow him to accomplish indirectly what the rape shield statute prohibits him from doing directly. That the question regarding prostitution was designed to be a "preliminary final argument" for the defense is illustrated by defense counsel's opening statement, in which the jury was informed that they would hear evidence about the "oldest profession," *i.e.*, prostitution, a theme that was repeated at length in closing argument. But other than Encalado's preposterous claim that the victim, a 24-year-old, pregnant woman on her way to a neighborhood bakery at 6:00 a.m., was a prostitute (a claim that Encalado had also used in connection with his attack on the corroborating witness), there was absolutely no evidence to support that assertion.

¶ 57    At the beginning of *voir dire*, the trial court informed the venire of the nature of the charges against Encalado and that he was presumed innocent of those charges. Central to Encalado's defense was not that the victim was a prostitute or that he paid her, in part, with drugs but rather that she agreed to have sex with him, and consequently, he was not guilty of the crimes charged. There was, therefore, nothing in the trial court's decision to preclude Encalado from suggesting during *voir dire* that the victim was a prostitute that deprived Encalado of a fair trial.

¶ 58    This is particularly true in this case given that the only way Encalado's jury would hear evidence regarding prostitution is if Encalado testified. Had Encalado exercised his right not to testify, as the vast majority of criminal defendants do (even those who profess pretrial an intention to testify), no evidence regarding prostitution would have been admitted. Thus, the question proposed by Encalado prefaced by "you will hear evidence of prostitution in this case" was an accurate statement only if Encalado testified. See *Gavin*, 2014 IL App (1st) 122918, ¶ 44 (purpose of *voir dire* is not to "measure the jurors' reactions to certain facts"). Yet, whether or not Encalado testified, if prospective jurors had been asked the question he proposed, they would have been left with the impression, as Encalado undoubtedly hoped, that the victim was a prostitute. The conditional relevance of the question (which was dependent on

- 11 -

Encalado's decision to testify) and its improper and unfounded insinuation underscores the propriety of the trial judge's decision not to allow it during *voir dire*.

¶ 59    No reported Illinois decision has found an abuse of discretion, much less an error of constitutional dimension, under analogous circumstances. *In re Commitment of Gavin*, 2014 IL App (1st) 122918, the only Illinois authority cited by the majority on this point, provides no support for the conclusion that there was any error in Encalado's jury selection. In *Gavin*, the respondent, in proceedings to determine whether he should be committed as a sexually violent person, proposed to question prospective jurors as to whether they could be fair given his conviction for indecent liberties with a child. The trial court denied the request, but allowed the respondent to ask whether jurors could be fair given his four convictions for sexually violent offenses. *Id.* ¶ 10. As noted, *Gavin* found no error and unequivocally stated that respondent's attempted use of *voir dire* to gauge prospective jurors' reactions to particular facts that would come out at trial was not proper. *Id.* ¶¶ 38-45. This is exactly what Encalado attempted to do here, and it was properly rejected by the trial court for the same reasons articulated in *Gavin*. *People v. Scaggs*, 111 Ill. App. 3d 633, 636 (1982), and *People v. Liapis*, 3 Ill. App. 3d 864, 868 (1972), also cited by the majority, stand for the unremarkable proposition that it is error to introduce evidence of a defendant's sexual conduct in prosecutions having nothing to do with that conduct.

¶ 60    The majority also relies on a number of cases from other jurisdictions, but like *Gavin*, none is on point. In particular, as support for its observation that "[c]ourts have noted potential juror bias *against persons who exchange sex for money*" (emphasis added) (*supra* ¶ 31), the majority cites *Commonwealth v. Harris*, 825 N.E.2d 58, 75 (Mass. 2005) (Marshall, C.J., concurring in part and dissenting in part, joined by Greaney, J.). What Justice Margaret Marshall's dissent in *Harris* actually says is "[p]rejudice or disbelief occurs with particular intensity when the complainant is a prostitute, and courts have long sought means to minimize *jury bias against prostitutes*." (Emphasis added.) *Id. Harris* says nothing about jury bias against men who patronize prostitutes. And it is ironic that the majority relies on *Harris* as supporting the result here given that Justice Marshall was dissenting from the majority's holding that the trial court could, in its discretion, admit evidence of the victim's past conviction for being a "common nightwalker" for impeachment purposes. *Id.* at 73. Justice Marshall persuasively argued that this result was at odds with the very protections the Massachusetts rape shield statute was designed to provide rape victims. ("Prostitutes are frequent victims of rape. [Citation.] Yet societal beliefs persist that prostitutes cannot be raped, or that they are not harmed by rape, or that they somehow deserved to be raped. [Citation.] In enacting the rape-shield statute, the [l]egislature could well have recognized that these prejudices outweighed the little—or nonexistent—probative value of a sexual conduct conviction in determining a rape complainant's credibility." *Id.* at 75-76.) Indeed, as Justice Marshall recognized, rape shield statutes were prompted, in large part, by the realization that jurors were unwilling to convict men who patronized prostitutes where the rape charge depended on the prostitute's testimony because jurors harbored such deep-seated biases against prostitutes and were unwilling to believe them. Thus, the majority's citation of *Harris* provides no support for its finding of error.

¶ 61    Significantly, unlike *Harris*, no Illinois court has held that despite the Illinois rape shield statute's prohibitions, a rape victim can nevertheless be impeached with a prostitution conviction. See *Sandoval*, 135 Ill. 2d at 178 ("Defendant's right of confrontation necessarily

includes the right to cross-examine witnesses, but that right does not extend to matters which are irrelevant and have little or no probative value. Complainant's past sexual conduct has no bearing on whether she has consented to sexual relations with defendant." (Internal quotation marks omitted.)); *People v. Buford*, 110 Ill. App. 3d 46, 50 (1982) (victim's past solicitation of prostitution conviction inadmissible over defendant's claim that victim had motive to fabricate so as not to establish violation of her probation on a federal conviction). As noted, the trial court prevented Encalado from cross-examining the corroborating witness about a past conviction for solicitation of prostitution, a ruling he does not challenge on appeal.

¶ 62     The other non-Illinois authorities cited by the majority are likewise unhelpful. *In re Commitment of Hill*, 334 S.W.3d 226 (Tex. 2011), involved a civil commitment proceeding in which the State was required to prove that the respondent was a repeat sexually violent offender and suffered from a behavioral abnormality that rendered him likely to engage in a predatory act of sexual violence. Part of the State's evidence that the respondent suffered from a behavioral abnormality was that, although heterosexual, respondent had engaged in homosexual activity with male inmates while in prison. During *voir dire*, respondent's counsel asked potential jurors whether they could be fair to an individual they believed to be a homosexual. After several members of the venire stated they could not be fair, the court terminated counsel's questioning. *Id.* at 228. *Hill* concluded that, particularly in light of admissions from several members of the venire that they could not be fair to a homosexual, the trial court's conduct in curtailing questions on the topic "prevented [respondent] from discovering the potential jurors' biases so as to strike them for cause or intelligently use peremptory challenges." *Id.* at 229.

¶ 63     Unlike homosexuals, whose causes and rights have prompted widespread national attention, there has been no similar public discourse about bias against men who pay women for sex. Thus, it is pure speculation to conjure that the mere mention of prostitution, particularly when the members of the venire had already been told of the nature of the charges against Encalado, would provoke such a negative response that a prospective juror would believe that he or she could not be fair. In other words, having heard that Encalado was accused of raping the victim vaginally and anally and of forcing her to perform oral sex on him, it is unlikely in the extreme that any juror who believed they could be fair and impartial notwithstanding that information would feel otherwise if they were told that evidence of prostitution would be introduced at trial.

¶ 64     *Wood v. Alaska*, 957 F.2d 1544 (9th Cir. 1992), actually supports the result reached in the trial court. In *Wood*, the defendant in a sexual assault case, who claimed he had a prior sexual relationship with the victim, sought to admit evidence that the victim told him she posed nude for *Penthouse* magazine, acted in pornographic films and had been paid to have sex while others watched. After a pretrial hearing, the court refused to admit the evidence. Affirming, the Ninth Circuit observed, "[t]he fact that [the victim] was willing to pose for *Penthouse* or act in sexual movies and performances says virtually nothing about whether she would have sex with [defendant]. It only tends to show that she was willing to have sex, not that she was willing to have sex with this particular man at this particular time." *Id.* at 1550. Further, the court found that evidence of the victim's past sexual activities unrelated to the defendant could persuade a jury "that a woman with her sexual past cannot be raped, or that she somehow deserved to be raped after engaging in these sexual activities." *Id.* at 1552-53. Similarly, Encalado's proposed

questioning of prospective jurors regarding prostitution was a thinly veiled effort to insinuate that the victim was a prostitute and, thus, less worthy of belief.

¶ 65 In closing, the majority attempts to cast its decision as benefitting women who work as prostitutes, but this argument cannot withstand analysis. If a woman who works as a prostitute is sexually assaulted, the rape shield statute protects her from a defendant's attempt to introduce her vocation to a jury. *Ivory*, 139 Ill. App. 3d at 453. Given that evidence of her prostitution would more than likely be inadmissible, it would be unnecessary (and illogical) for the State in such a case to query a venire as to their attitudes about prostitutes.

¶ 66 The Illinois legislature has decided that in prosecutions for sexual assaults, the fact that the victim is a prostitute is, with limited exceptions not applicable here, inadmissible. It is impossible to understate Encalado's burden to demonstrate error in the trial court's refusal to allow him to ask prospective jurors whether the mention of prostitution could affect their ability to be fair and impartial. He must show not only that no reasonable judge would have refused to allow the question proposed by defense counsel but also that the failure to propound that single question to the venire is an error of constitutional dimension rendering his trial fundamentally unfair. And given the absence of any controlling authority in Illinois, or anywhere else for that matter, the trial court's refusal to introduce the topic of prostitution into jury selection simply cannot be deemed an abuse of discretion. The evidence against Encalado was, by any measure, overwhelming, and so if there was constitutional error, it was harmless beyond a reasonable doubt. See *In re E.H.*, 224 Ill. 2d 172, 180-81 (2006).

¶ 67 If a defendant like Encalado *must* be allowed to ask prospective jurors about prostitution because without that question he cannot be assured of a fair and impartial jury, then all a defendant need do to circumvent the protections of the rape shield statute is claim that the victim is a prostitute and that his patronization of a prostitute is so sensitive as to mandate *voir dire* questioning on the subject. It is not difficult to imagine that rape victims might well be discouraged from coming forward if they knew that it would be suggested to a roomful of strangers that they were prostitutes before they had even taken the stand. This transparent ploy was properly rejected by the trial court. I would affirm.