# Illinois Official Reports

## Supreme Court

---

### *People v. Encalado*, 2018 IL 122059

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. THEOPHIL ENCALADO, Appellee. |
| Docket No. | 122059 |
| Filed | March 22, 2018 |
| Rehearing denied | May 29, 2018 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Matthew E. Coghlan, Judge, presiding. |
| Judgment | Appellate court judgment reversed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Kimberly M. Foxx, State's Attorney, of Chicago (David L. Franklin, Solicitor General, Michael M. Glick and Evan B. Elsner, Assistant Attorneys General, and Alan J. Spellberg, Annette Collins, and Mary P. Needham, Assistant State's Attorneys, of counsel), for the People. |
| | Michael J. Pelletier, State Appellate Defender, Patricia Mysza, Deputy Defender, and Jennifer L. Bontrager, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee. |

The John Marshall Law School Pro Bono Program & Clinic, of Chicago (J. Damian Ortiz and Mengjie Zou, of counsel, and Chandne Jawanda, Christina Wood, and Titanila Halajovo, law students), *amicus curiae*.

Justices JUSTICE BURKE delivered the judgment of the court, with opinion.
Chief Justice Karmeier and Justices Freeman, Thomas, Kilbride, Garman, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1 The defendant in the case at bar, Theophil Encalado, asked the trial court during *voir dire* to question the venire about whether evidence that he had engaged the services of a prostitute would influence the prospective jurors' judgment in any way. The circuit court of Cook County refused defendant's request, and he was subsequently found guilty on three counts of aggravated criminal sexual assault.

¶ 2 On appeal, the appellate court, with one justice dissenting, reversed defendant's convictions and remanded for a new trial, holding that the trial court "abused its discretion when it refused to ask venire members questions about potential bias against persons who participate in prostitution." 2017 IL App (1st) 142548, ¶ 1.

¶ 3 For the reasons that follow, we reverse the judgment of the appellate court.

¶ 4 Background

¶ 5 Defendant was indicted on 15 charges of aggravated criminal sexual assault and 3 charges of criminal sexual assault. In the indictment, it was alleged that, on the morning of March 5, 2006, defendant knowingly, and by the use of force or threat of force, committed acts of oral, vaginal, and anal sexual penetration upon Y.C.

¶ 6 Prior to defendant's trial, the State filed a motion to admit other crimes evidence to show that defendant committed similar sexual assaults against J.H., C.C., and S.A. Following a hearing, the trial court granted the State's request with respect to C.C. and S.A., allowing admittance of other crimes evidence to show intent, lack of consent, and propensity. The court denied the State's request with respect to J.H. but ruled that the State could impeach defendant with his conviction for predatory criminal sexual assault against J.H. if he chose to testify.

¶ 7 After the trial court ruled to allow the admission of other crimes evidence, defense counsel advised the court that defendant intended to testify that Y.C., C.C., and S.A. all consented to having sex with defendant in exchange for the payment of cash and drugs but that, after they provided the agreed services, defendant took back the payments he made. Counsel stated that the jurors "are going to hear evidence that [defendant] did engage in soliciting and using prostitutes." Accordingly, defense counsel asked the court to inquire of the venire whether "[t]he fact that you will hear evidence about—and just put it mildly—to not try to indoctrinate

- 2 -

them at all—you will hear evidence about prostitution. Would that fact alone prevent you from being fair to either side?" The court refused the request, finding that the question was improper because it would be "asking them to comment on particular types of evidence that they may hear."

¶ 8 The matter proceeded to trial on 6 of the 18 counts of aggravated criminal sexual assault committed against Y.C. At trial, Y.C. testified that around 6 a.m. on March 5, 2006, as she was walking on Sawyer Street in Chicago to go to a bakery, she saw a car parked across the street with a man inside. The man, whom she did not recognize but later identified as defendant, called to her. Y.C. crossed the street on her way to the bakery, bringing her closer to the car. Defendant then called out to her again, saying "[Y]o, your cousin Jose, he was looking for you." Because Y.C. had a cousin Jose who lived a few blocks away, she went over to the car and asked what Jose wanted. Defendant, said, "He needs you." Y.C. then got into defendant's car.

¶ 9 Once Y.C. was in defendant's car, he began driving in the opposite direction. Y.C. asked where they were going, and defendant said, "[Y]ou know what this is." Y.C. testified she did not know what he meant but thought perhaps she was going to be robbed. Defendant then proceeded to an alley where there were no other cars or people. At this point, Y.C. testified, she became very frightened. She told defendant that she was pregnant and begged defendant not to do anything to harm her or her unborn child. Defendant, however, cursed at her and told her to shut up.

¶ 10 Y.C. testified that she tried to open the car door but it was locked. Defendant became angry and began to strike her repeatedly in the face. Also, he opened the glove compartment, showed her a pistol, and threatened to kill her. Defendant then forced Y.C. to perform oral sex on him, after which he sexually penetrated her vaginally and anally. When defendant was finished, he ordered Y.C. out of the car. As Y.C. tried to "fix" herself because her pants and underwear fell off her feet, defendant threw her shoe and underwear out of the car. Also, defendant began pushing Y.C. out of the car and told her that if she did not leave his car immediately, he would kill her.

¶ 11 After defendant drove away, Y.C. ran into the street and tried to wave down cars. At this point, Deputy Fernando Rodriguez of the Cook County Sheriff's Office happened along, saw Y.C., and stopped to help her. He took Y.C. to the police station and then to the hospital, where a sexual assault kit was collected. Subsequent analysis of the kit showed the presence of semen in the vaginal and anal swabs. Forensic testing matched defendant's DNA to the vaginal sample but not to the anal sample.

¶ 12 Y.C. testified that she moved to South Carolina in 2007 and, in 2009, she went to a South Carolina police department to view a photo array. From this photo array, she was able to identify defendant as her assailant. In addition, in May 2009, she came to Chicago to view a physical lineup. Again, she identified defendant as her attacker.

¶ 13 Deputy Rodriguez testified, confirming that on March 5, 2006, as he was driving northbound on Kedzie Avenue near Moffat Street, he saw Y.C. in the middle of the street, frantically waving her arms and trying to persuade passing cars to stop. Deputy Rodriguez described Y.C. as very distressed. He said she had blood on her mouth, was crying hysterically, was shaking, and was unable to speak at times. He took Y.C. to the police station and then to the hospital.

¶ 14     The State then presented evidence that defendant had committed similar acts of sexual assault against C.C. C.C. testified that on the evening of September 1, 2002, she had gone to the Red Dog Club on North Avenue in Chicago with her sister. C.C. said she decided to leave the club to get some fresh air and sit in her sister's car. As she walked toward the car, a man[1] drove up and asked if she needed a ride. Initially, she said no. However, when she could not find her sister's car and because it was very cold outside, when defendant drove up again, she got into his car. C.C. testified that she did not recognize the man and that, after she entered the car, he put a bandana on his face, which kept her from getting a good look at him.

¶ 15     When the man put the bandana on, C.C. asked him what he was doing. The man punched her in the mouth, displayed a knife, and told her to shut up. Because C.C. began screaming, the man punched her again. C.C. tried to get out of the car, but the door was locked. Defendant then told her to take her clothes off and that "it was going to happen whether [she] liked it or not." C.C. testified that she started crying but defendant ignored her cries, jumped on top of her, and sexually assaulted her, penetrating her vaginally. When he was done, he told her to put her clothes on as he drove back to the club. At the club, he told C.C. to get out of the car. But before she did, he tore her jewelry off.

¶ 16     C.C. testified that when she got back to the club she contacted the police, who were already at the club because they provided security at closing time. C.C. was taken to the hospital, where a sexual assault kit was collected. Evidence was presented to show that defendant's DNA matched the swab taken at the hospital. The State then rested its case.

¶ 17     Defendant testified in his own defense. He admitted that he had sex with Y.C. and C.C. and also admitted he had a prior conviction for predatory criminal sexual assault. However, defendant claimed that, on March 5, 2006, he had gone to the area near Armitage Road and Kedzie Avenue because it was an area known for prostitution. He said he saw Y.C., pulled up next to her, and asked her for a date, "if she was working." According to defendant, Y.C. said "Yes" and immediately got into his car. Defendant said he offered Y.C. money and marijuana in exchange for oral and vaginal sex and she agreed. He then parked in an alley, where they engaged in consensual oral and vaginal intercourse.

¶ 18     Defendant further testified that, because he was not able "to finish," he decided to grab the money and marijuana back. He said this enraged Y.C., who began swinging at him and yelling at him, demanding the money back. Defendant said he then opened the door, grabbed Y.C.'s pants and underwear, threw them out of the car, and told Y.C. to get out. Defendant admitted threatening Y.C. that she "better not be here when I get back." Defendant denied punching Y.C. and denied having a gun. On cross-examination, defendant admitted that he penetrated Y.C.'s anus "accidentally." Defendant claimed he immediately stopped and apologized.

¶ 19     With regard to C.C., defendant testified that he picked her up on September 1, 2002, around North Avenue and Wood Street, another area known for prostitution. Defendant said he saw C.C. on the street and honked at her and she came over to his car. He then negotiated with her, offering her $60 and some cocaine in exchange for oral and vaginal sex. When she agreed, she got into his car, and he drove to a parking lot, where they engaged in sex. He testified further that, after having sex, he "did the same stupid act. I took—I went and took my money back from her." Defendant claimed that when he took the money back, C.C. slapped him and

_____
[1]C.C. was never able to identify defendant as her assailant, but DNA linked defendant to the attack.

pulled his hair. He then reached over and pushed her out of the car and drove away. Defendant denied forcing C.C. to have sex, punching her, having worn a bandana, having a knife, or taking C.C.'s jewelry. Defendant admitted he had been convicted of predatory criminal sexual assault but denied sexually assaulting either Y.C. or C.C. Defendant then rested.

¶ 20    The jury found defendant guilty on three counts of aggravated criminal sexual assault. In a motion for a new trial, defendant again raised the issue of the court's refusal to question the venire about prostitution. The trial court denied the motion for a new trial. Defendant was sentenced to 20 years' imprisonment on each of the three counts of aggravated criminal sexual assault, with each sentence to run consecutive to each other and consecutive to defendant's sentence in the predatory criminal sexual assault case.

¶ 21    The appellate court, with one justice dissenting, reversed defendant's convictions and remanded for a new trial. 2017 IL App (1st) 142548. The court held that the circuit court abused its discretion when it refused to question the venire members about any potential bias they might have in connection with prostitution.

¶ 22    We granted the State's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Mar. 15, 2016). We also allowed The John Marshall Law School's Pro Bono Program & Clinic to file an *amicus curiae* brief in support of the State. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 23                                                     Analysis

¶ 24    A criminal defendant has a constitutional right to trial by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); *People v. Strain*, 194 Ill. 2d 467, 475 (2000). To secure this right, inquiry is permitted during *voir dire* " 'to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried.' " *People v. Lobb*, 17 Ill. 2d 287, 300 (1959) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993). Jurors "must harbor no bias or prejudice which would prevent them from returning a verdict according to the law and evidence." *Strain*, 194 Ill. 2d at 476.

¶ 25    The manner, extent, and scope of *voir dire* examination rests within the discretion of the trial court. *Id.*; *People v. Terrell*, 185 Ill. 2d 467, 484 (1998); *People v. Rinehart*, 2012 IL 111719, ¶ 16. However, "the trial court must exercise its discretion in a manner consistent with the purpose of *voir dire*." *Strain*, 194 Ill. 2d at 476. "An abuse of discretion occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice." *Rinehart*, 2012 IL 111719, ¶ 16. "To be constitutionally compelled, it is not enough that a *voir dire* question be helpful[;] rather, the trial court's failure to ask the question must render the defendant's proceedings fundamentally unfair." *Terrell*, 185 Ill. 2d at 485.

¶ 26    The appellate court below observed that various courts have noted that certain sexual behaviors, including prostitution, can evoke "strong responses." 2017 IL App (1st) 142548, ¶ 31. The appellate court further observed that a number of jurisdictions use public shaming against patrons of prostitutes as a means to reduce prostitution because "legislatures and the customers of women who exchange sex for money know that many persons feel strong disgust

- 5 -

and antipathy toward the patrons of prostitutes." *Id.* ¶¶ 32-33. Based on these observations, the appellate court concluded that "jurors may hold similar biases against customers of women who exchange sex for money." *Id.* ¶ 32. From this, the appellate court reasoned that, because the jury in this case was going to hear evidence that defendant patronized prostitutes, his proffered question should have been put to the jurors so he could ascertain whether they were free from bias. Relying largely on this court's decision in *Strain*, the appellate court then concluded that, because the question was not asked, defendant's *voir dire* proceeding was fundamentally unfair and his convictions had to be reversed. We disagree.

¶ 27    The relevant question in this case is not whether patrons of prostitutes can be made to feel ashamed if their behavior is publicized or whether prostitution evokes "strong responses" in the minds of the public. Rather, the question is whether prospective jurors harbor such bias against those people who patronize prostitutes that the jurors will not believe the testimony of such a person or be able to give that person a fair hearing. It is the jurors' ability to fairly consider the evidence before them that is the critical issue. See, *e.g.*, *Cloutier*, 156 Ill. 2d at 495-96 (the purpose of *voir dire* is to ascertain and remove those jurors whose "minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath").

¶ 28    This point was made clear in *Strain*. In *Strain*, the defendant was charged with first degree murder. The State's theory of the case, which was advanced before trial, was that the murder victim was an innocent bystander who was killed during an attempted retaliation for a previous gang shooting. *Strain*, 194 Ill. 2d at 469-73. Because gang testimony was certain to be prevalent throughout the trial, the defendant asked the trial court to question the potential jurors during *voir dire* as to whether they would find the defendant less believable if they learned he was a member of a gang. *Id.* at 471-72. The trial court refused to ask the defendant's questions, and after a trial that was "permeated" with gang information (*id.* at 473), the defendant was convicted. On appeal, the appellate court reversed the defendant's conviction because the trial court had refused the proffered questions and, as result, the defendant was denied a fundamentally fair *voir dire* proceeding.

¶ 29    In affirming the judgment of the appellate court, this court in *Strain* made clear that gang-related testimony was pervasive throughout the trial, being offered not only by detectives and police officers assigned to gang units but also by gang members themselves. *Id.* at 477-78. The court also emphasized that the outcome of the trial turned on the credibility of the defendant, various police officers, and members of gangs. *Id.* at 473. Finally, and of particular relevance here, the court in *Strain* pointed to a substantial body of Illinois law that holds that street gangs are regarded with considerable disfavor by other segments of our society and that, unless there is sufficient proof that membership or activity in a gang relates to the crime charged, evidence that a defendant is a gang member is generally excluded because of its prejudicial effect. *Id.* at 477. We then explained that "[t]he same concerns regarding the prejudicial effect of gang evidence dictate our holding that, when testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, the defendant must be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court, concerning gang bias." *Id.*

¶ 30    The *voir dire* questions in *Strain* were not required because gang members feel ashamed of being in a gang, or simply because gang membership provokes strong feelings in the public.

Instead, the questions were required because the public views the testimony of gang members with skepticism and may, therefore, fail to consider the testimony of a gang member without prejudice. And, importantly, this fact was established by a substantial body of case law.

¶ 31 There is no similar body of law here. None of the articles or decisions cited by the appellate court below discuss how members of the general public treat the testimony of those who patronize prostitutes. And none of the authorities establish that the public harbors bias against the patrons of prostitutes to the extent that such a person's testimony cannot be considered fairly. See 2017 IL App (1st) 142548, ¶¶ 59-63 (Mason, J., concurring in part and dissenting in part).

¶ 32 Our decision in *Strain* is distinguishable from the present case in another important respect. In *Strain*, there was no dispute that the majority of the witnesses who testified were gang members. The defendant himself, although he denied being a gang member at the time of the offense, admitted to being a gang member for many years. *People v. Strain*, 306 Ill. App. 3d 328, 332 (1999). In other words, in *Strain*, the gang affiliation of the witnesses was a matter that was both inescapably a part of the trial and a matter that was not in dispute by either party. See also, *e.g.*, *People v. Peeples*, 155 Ill. 2d 422, 459-60 (1993) (noting that *voir dire* questions regarding attitudes on race are required only where it is clear that racial issues are " 'inextricably bound up with the conduct of the trial' " (quoting *Ristaino v. Ross*, 424 U.S. 589, 597 (1976))).

¶ 33 In this case, in contrast, it was disputed whether Y.C. and C.C. were, in fact, prostitutes. Thus, defendant's proffered question did not involve a matter that was indisputably true and inextricably a part of trial. Rather, the question amounted to a preliminary argument regarding a disputed question of fact. This type of questioning during *voir dire* is generally not permitted. See, *e.g.*, *Rinehart*, 2012 IL 111719, ¶ 17 (specific questions tailored to the facts of the case and intended to serve as " 'preliminary final argument' " are generally impermissible (quoting *People v. Mapp*, 283 Ill. App. 3d 979, 989-90 (1996))); *People v. Bowel*, 111 Ill. 2d 58, 64-65 (1986) (questions designed to educate the jurors on the defendant's theory of defense and ensure the selected jurors are receptive to that defense are generally prohibited).

¶ 34 Further, defendant's proffered question must be considered in the context of the charges made against him. Defendant was charged with, *inter alia*, intentionally committing acts of sexual penetration upon the victim's vagina, anus, and mouth while armed with a firearm. The members of the venire were informed of these charges and were asked by the trial court during *voir dire* whether there was anything about the nature of the charges that would prevent them giving both sides a fair and impartial trial. Some members of the venire were excused when they informed the court that, because of personal experiences with sexual assault, they could not fairly consider the evidence and remain impartial. The remaining members of the jury were accepted by both sides and deemed capable of considering the evidence fairly and without prejudice. Thereafter, at trial, the jury heard extensive, explicit testimony regarding the sexual conduct committed by defendant, much of which was given by defendant himself. Even if it were true that Y.C. and C.C. were prostitutes, it is difficult to conceive how a juror who could fairly judge the explicit sexual conduct would be rendered incapable of fairly judging defendant based on the fact he patronized prostitutes.

¶ 35 The trial court in the case at bar conducted a thorough *voir dire*, asking all members of the venire, among other things, whether they could follow the law and obey the instructions given

by the court and whether they would use sympathy, bias, or prejudice in reaching a decision. Further, there is no body of law that holds that the testimony of patrons of prostitutes is treated with skepticism by the public. In addition, allowing defendant's proffered question would have permitted defendant to preargue a disputed issue of fact. Given these circumstances, we cannot say that refusing defendant's proffered question regarding prostitution rendered the *voir dire* proceeding fundamentally unfair. Accordingly, we hold that the trial court did not abuse its discretion in denying defendant's question.

¶ 36                                    Conclusion

¶ 37        For the foregoing reasons, the judgment of the appellate court is reversed.

¶ 38        Appellate court judgment reversed.