2023 IL App (1st) 211383-U

THIRD DIVISION
May 10, 2023

No. 1-21-1383

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 16031 |
| | ) | |
| OSCAR FLORES, | ) | Honorable |
| | ) | Peggy Chiampas, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in summarily dismissing defendant's *pro se* postconviction petition because his appellate counsel was not ineffective for failing to raise a meritless claim on direct appeal.

¶ 2    Defendant Oscar Flores appeals the trial court's first stage dismissal of his postconviction petition, arguing he set forth the gist of a constitutional claim of ineffective assistance of appellate counsel. Specifically, he contends that his appellate counsel was ineffective for failing to argue that the trial court erred in refusing defendant's request to ask potential jurors questions regarding their opinions toward gangs when gang evidence would be prevalent at trial.

¶ 3    Following a jury trial, defendant was found guilty of the May 2007 first-degree murder of Victor Casillas, with the additional finding that defendant personally discharged a firearm that proximately caused Casillas's death. Defendant was also found guilty of the attempted murder and aggravated battery with a firearm of Leonel Medina. The trial court subsequently sentenced defendant to a term of 29 years for the first-degree murder conviction with an additional 25-year firearm enhancement, 20 years for the attempted murder conviction, and 6 years for the aggravated battery conviction, to be served consecutively, for a total sentence of 80 years' imprisonment.

¶ 4    In his initial direct appeal, this court reversed and remanded for a new trial based on a finding that defendant had invoked his right to remain silent and any subsequent statements were inadmissible. *People v. Flores* (*Flores I*), 2014 IL App (1st) 121786, ¶ 63. This court also found MySpace photographs introduced by the State to be admissible, but held that the captions were to be redacted because the State could not establish who wrote the captions. *Id.* ¶ 79.

¶ 5    On remand, defendant's second jury trial was conducted in July 2015. Prior to jury selection, defense counsel requested the trial court question the prospective jurors "about any bias or prejudice they may have regarding gangs because the courts have held that it's such a sensitive issue and people have very strong feelings about it." Counsel explained that she had drafted "questions designed to determine whether or not they know people in gangs, whether or not they have had any interaction with gangs, and whether or not they have strong feelings about gangs that would affect their ability to be fair." Counsel also requested questions about whether the prospective jurors had ties to any community watchdog groups and had strong feelings about guns that would affect their ability to be fair.

¶ 6    In response, the prosecutor argued that the appropriate question was something similar to

questions posed regarding the credibility of the testimony of police witnesses. He suggested a question informing the jurors that they would hear evidence of gang involvement in the case, and asked if that would cause them to be unfair. The prosecutor contended that the questions requested by the defense were not appropriate questions. After the discussion, the court ruled that she would ask the standard question the same way the court would ask about the testimony of police witnesses and denied the rest of the defense's questions.

¶ 7    During *voir dire*, the court asked the following questions of the first potential juror.

> "Q. And sir, this next question, would you judge the testimony or weigh the testimony of each witness the same, regardless of their profession or what they do for a living?
>
> And what this boils down to, for everyone, is this, that you're not going to take [the credibility of] a policeman more than a civilian witness or less than a civilian witness, that you're going to take it the same manner on each witness and base it on how they testify, regardless of their profession.
>
> A. Yes.
>
> Q. And sir — and this is for everyone.
>
> Ladies and gentlemen, there may be — there will be evidence presented or testified to or alleged in regards to gang activity in this case, and individuals that testify may or may not be affiliated with certain gangs.
>
> And sir, can you take their testimony in the same light, manner as any other witness in the case?
>
> A. Yes."

¶ 8    For the subsequent potential jurors, the trial court asked a similar version of this question,

"would you give each witness that testifies the same weight, level of credibility, regardless of if they are a police officer, alleged gang member, or any other witness ***?"

Each of the selected jurors answered in the affirmative.

¶ 9    The pertinent evidence presented at defendant's jury trial was the following.

¶ 10    Leonel Medina testified that in March 2007, he was a member of the Two Six gang, but at the time of trial, was no longer a gang member. On March 19, 2007, at approximately 8:30 p.m., Medina was walking east on 30th Street near South Kildare Avenue in Chicago on his way to a friend's house. He turned to walk north on Kildare and noticed a blue and gray Astro van stop at the intersection. He observed two people in the van, a driver and a passenger. He described the occupants as male Hispanics, and "they seemed young." The passenger then pulled out a gun and began to shoot. Medina estimated that he was 20 feet away from the passenger side of the van. The passenger fired four to six times in Medina's direction and Medina began to run north on Kildare. He observed the van turn east onto 30th Street and heard the tires "peal out [*sic*]" and someone yelled the word, "king." Medina continued to his friend's house on South Kildare Avenue. When he arrived, he noticed blood on his thighs and realized he had been shot. He had four gunshot wounds, two on each of his thighs. He called 911 and an ambulance arrived to transport him to the hospital. He later spoke with the police about the shooting. Medina subsequently viewed a photo array and lineups, but did not identify anyone.

¶ 11    Leonardo Gonzalez testified that he was a former member of the Two Six street gang with Victor Casillas. In March 2007, Gonzalez was 16 years old, and Casillas was 15 years old.

¶ 12    On March 19, 2007, Gonzalez spent the day with Casillas at both Casillas's house and Gonzalez's house. They smoked marijuana and played video games. Around 4 p.m., they went to

Piotrowski Park to "hang out." Gonzalez was unsure what time they left the park, but testified that it "was still just a little bit light but it was getting dark." They were walking on West 30th Street near South Karlov Avenue when he heard three or four gunshots behind them. Gonzalez told Casillas that they needed to "get the heck out of here." Gonzalez thought a rival gang might have fired the shots and testified that the rivals of the Two Six were the Latin Kings and Maniac Latin Disciples. They started to walk away toward Gonzalez's house at South Karlov Avenue and West 26th Street.

¶ 13    As they were walking, a van drove behind them and caught Gonzalez's attention. Gonzalez could not remember the color of the van, but described it as an Astro van. According to Gonzalez, Casillas made a gang sign disrespectful to the Latin Kings, specifically, "throwing the crown down." Gonzalez testified that he was on the passenger side of the van. The passenger in the van pulled out a gun and Gonzalez "froze" as Casillas started to run. Gonzalez could not see the passenger and he was unable to tell if the passenger was a man or a woman, black or white or Hispanic. Gonzalez described the gun as an automatic, square, and black. The passenger then fired the gun.

¶ 14    Gonzalez fell to the pavement. He then heard Casillas scream as he had been shot. Gonzalez went toward Casillas. Gonzalez testified he threw bottles from the street at the van. The van then drove off towards South Pulaski Road. Gonzalez remained with Casillas until the police arrived. He told the police that he did not know who the shooter was.

¶ 15    Later, on May 24, 2007, Gonzalez went to the police station and viewed a lineup. Gonzalez testified that he identified someone in the lineup, but he told the police that he did not know "if it's him." He identified defendant in court as the person he selected in the lineup.

¶ 16    Gonzalez did not remember speaking with Assistant State's Attorney (ASA) Stephanie Miller on May 24, 2007, but admitted that his signature appeared on a handwritten statement prepared by ASA Miller. He also identified two exhibits attached to the statement, one was a photograph of Casillas and the other was a photograph of defendant. Gonzalez admitted that he spoke with ASA Miller because the police "were making [him] mad." Gonzalez wanted to go to the hospital to visit his friend, and the police told him that he could not go until he talked to them. The prosecutor then asked a question to clarify Gonzalez's testimony and asked Gonzalez if the statement he gave in May 2007 was given because of the way the police treated him after Casillas's murder in March. Gonzalez again responded that "they were making me mad because they wouldn't let me see my friend." Gonzalez admitted that in the statement he told the ASA that the passenger pulled out a black semiautomatic handgun and fired two shots, hitting Casillas, and he identified an attached photograph of defendant as the shooter. Gonzalez also testified he did not remember telling ASA Miller that he had not been threatened or made promises in order for him to provide the statement about the shooting. Gonzalez then testified that he was "really high" when giving the statement. He did not remember if he said that he was under the influence of drugs or alcohol in the statement. Gonzalez also did not remember testifying before the grand jury in June 2007. The prosecutor asked Gonzalez about specific testimony he gave before the grand jury, but Gonzalez did not recall any of the testimony.

¶ 17    On cross-examination, Gonzalez testified that on the night of the shooting in March 2007, he did not identify anyone. Later in May 2007, he identified defendant in a lineup. Between those dates, Casillas's brother, Antonio Casillas came to Gonzalez with defendant's photograph and told Gonzalez to identify defendant. Antonio was not present at the time of the shooting.

Gonzalez testified that defendant was not the shooter. Defendant was a Latin King, and he believed a Latin King had committed the crime.

¶ 18    On redirect, Gonzalez remembered meeting with defense counsel and an investigator in June 2015. During that meeting, Gonzalez told them that Antonio and Casillas's mother wanted him to identify defendant because "the mom wanted justice." Gonzalez admitted that the June 2015 meeting was the first time he mentioned that Casillas's mother asked him to identify defendant.

¶ 19    ASA Stephanie Miller testified that she met with Gonzalez on May 26, 2007, and into May 27, 2007, at the Area 4 police district. She had a conversation with Gonzalez with a detective present and later took a handwritten statement from Gonzalez. In the statement, Gonzalez identified defendant in a photograph as the person who shot Casillas. During the interview, Gonzalez did not appear to be under the influence of drugs or alcohol. ASA Miller asked Gonzalez outside the presence of any police officers how he had been treated and if he had been threatened by anyone. Gonzalez told her that he had not been threatened and did not disclose any threats from Antonio Casillas.

¶ 20    ASA Bonnie Greenstein testified that she presented Gonzalez to the grand jury on June 14, 2007. When she spoke with him prior to his testimony, Gonzalez did not tell her that he was forced to make an identification in a lineup. He did not make any complaints about the police or ASA Miller. Gonzalez also did not state that he was forced to make an identification by Antonio Casillas. During his testimony, Gonzalez identified defendant as the shooter and the passenger in the van. Gonzalez could not view the driver because the driver was wearing a "hoodie." He also testified that he was not under the influence of drugs or alcohol and that he had been treated "good."

7

¶ 21    Lorena Aguilar testified that at around 8:30 p.m. on March 19, 2007, she was walking east on West 30th Street, between South Tripp Avenue and South Kildare Avenue, with her friend Elizabeth Hernandez when they heard gunshots. She looked behind them and observed a Chevy Astro van. When the van passed them, Aguilar saw two Hispanic males about 19 or 20 years old. She described the passenger as wearing a white t-shirt. After the van passed them, she heard more gunshots. They ran toward the gunshots and observed a boy on the ground "choking up" blood. She remained on the scene until the police arrived and told them which direction the van had traveled. Aguilar later viewed a photo array and two lineups but was unable to identify anyone.

¶ 22    Lizette Martinez and Rita Serrano testified similarly that around 8:30 p.m. on March 19, 2007, they were walking Martinez's dog eastward on West 30th Street, when they heard gunshots behind them. Both women observed a gray van pass them with two occupants, a driver and a passenger. They then heard two more gunshots in front of them, near West 30th Street and South Karlov Avenue. When they went to that location, they each observed a young man on the sidewalk who had been shot.

¶ 23    Serrano described the passenger in the van as a bald Hispanic male wearing a white t-shirt. Martinez observed the van occupants were male but was unable to discern their race. Both women separately viewed a photo array and a lineup, but neither made an identification.

¶ 24    Antonio Casillas testified that Victor Casillas was his younger brother. On March 19, 2007, Antonio was at home with his mother at the time of the shooting. His mother answered a phone call and learned that Casillas had been shot. Antonio went to West 30th Street and South Karlov Avenue with his mother. When he arrived, Antonio observed Casillas on the ground and the paramedics were trying to revive him. Casillas was taken from the scene and Antonio later

learned that his brother had passed away. On March 21, 2007, Antonio received a phone call from an individual named Angel Rodriguez. Rodriguez told him that an individual from Farragut High School known as "Little Rowdy" was "bragging" about shooting Casillas. Rodriguez also told him that "Little Rowdy" was a Latin King member from near West 27th Street and South Drake Avenue. Antonio had heard the name "Little Rowdy," but did not know who "Little Rowdy" was.

¶ 25     Also on March 21, 2007, Antonio was visited by his cousin Cindy Bahena. Bahena had a MySpace social media account at that time, but Antonio did not. They logged into MySpace through the account of an individual named Gladys. They looked for photographs of "Little Rowdy." They sent a friend request to "Little Rowdy," which he accepted. They were then able to view photographs on that account. On "Little Rowdy's" account, they viewed photographs of Casillas and defendant. Antonio did not know defendant's name when he viewed the photographs on MySpace. Antonio subsequently obtained a Farragut High School yearbook and found a photograph showing the same individual as the MySpace photograph and the name listed was Oscar Flores. Antonio identified defendant in court as the individual in the photographs. Antonio later shared this information with a detective working on the investigation and also provided the detective with login information to access MySpace.

¶ 26     On cross-examination, Antonio admitted that he was formerly a member of the Two Six gang, but testified that he quit in 2004 or 2005. He denied knowing that Casillas or Gonzalez were Two Six members. Antonio did not recall the year of the Farragut yearbook he viewed. Defense counsel asked Antonio if he recalled prior testimony in which he testified viewing the 2006 to 2007 yearbook, but he could not recall. Antonio denied "having it out for Little Rowdy" after speaking with Rodriguez.

¶ 27 Antonio also denied showing defendant's picture to Gonzalez. Antonio testified that he knew of Gonzalez, but did not know Gonzalez was friends with his brother. He admitted that he called Gonzalez to tell him that the police were looking for him, but did not tell Gonzalez about the MySpace photograph.

¶ 28 Evangeline Martinez testified that she was Casillas's mother. She knew Gonzalez was friends with Casillas, but denied having any conversations with Gonzalez after Casillas's death. Martinez further denied telling Gonzalez that he needed to identify anyone in the case, and specifically did not tell him to identify defendant.

¶ 29 Yolanda Gutierrez testified that her 1989 Chevy Astro van was stolen on March 16, 2007, and she did not know who stole her vehicle.

¶ 30 Detective Greg Swiderek testified that on March 19, 2007 around 8:40 p.m., he and his partner, Detective David Roberts, were assigned to investigate a shooting that occurred near West 30th Street and South Karlov Avenue. They proceeded to that location, and when they arrived, Casillas had already been removed from the scene. Detective Swiderek then learned of another crime scene at West 30th Street and South Kildare Avenue and he went to that location. There were forensic investigators at both locations collecting evidence and taking photographs. He also spoke with Medina about the shooting, but after their conversation, Detective Swiderek did not have a suspect in the shooting.

¶ 31 On March 28, 2007, Detective Swiderek spoke with another officer who informed him that Antonio told that officer that an individual called Little Rowdy was bragging about the shooting on MySpace and at Farragut High School. The officer gave him the name Oscar Flores, but the officer knew defendant as Little Panther, not Little Rowdy.

¶ 32    Detective Swiderek obtained a photograph of defendant and showed it to Antonio. Antonio told the detective it was same picture he had viewed on MySpace of the individual bragging about the shooting. Detective Swiderek received the two MySpace photographs obtained by Antonio of defendant and Casillas. Detective Swiderek created a photo array which was shown separately to Martinez, Serrano, Aguilar, and Hernandez, but none of the women were able to make an identification.

¶ 33    In May 2007, Martinez, Serrano, Aguilar, and Hernandez each viewed a lineup which included defendant, but none were able to make an identification. Gonzalez also viewed the lineup and identified defendant as the person who shot Casillas. Gonzalez did not tell Detective Swiderek that he was having second thoughts about identifying defendant. Detective Swiderek also testified that no one in his presence threatened Gonzalez to make an identification. Gonzalez did not tell him that Antonio had threatened him to identify defendant, that he identified defendant because Casillas's mother begged him to make an identification, or that he identified defendant because he was a Latin King.

¶ 34    In June 2007, Detective Swiderek interviewed codefendant Macias about the shootings. Detective Swiderek showed Macias defendant's photograph. The detective asked Macias if defendant was involved in the shooting. He also showed Casillas's picture to Macias and asked if he knew who Casillas was. During the interview, Macias made an incriminating statement and was subsequently charged with murder and attempted murder. Gonzalez, Medina, Aguilar, Serrano, and Martinez each viewed a lineup with Macias, but no one made an identification. Defendant was arrested in July 2007.

¶ 35    On cross-examination, Detective Swiderek testified that he was given the photographs of defendant and Casillas by another officer, and later Antonio showed him the photos on a

computer at Antonio's house. Defense counsel asked if it was correct that the only person who could connect defendant to the nickname Little Rowdy was Antonio. Detective Swiderek responded that Macias connected defendant to the name. Counsel asked the detective if he remembered prior testimony in which he testified that Antonio and Bahena were the only people who could connect defendant to the nickname, and Detective Swiderek answered that he could have said that. He admitted that he never spoke with Bahena, but another detective spoke with her. Detective Swiderek admitted that he was never on the MySpace page for Little Rowdy, nor did he make any efforts to connect defendant to the MySpace page.

¶ 36    On redirect, Detective Swiderek testified that he showed Macias a picture and Macias indicated that defendant was Little Rowdy. On recross, he admitted that when Antonio gave him the MySpace photographs and said he had been bragging about the shooting, that information was a tip. On redirect, over defense counsel's objection, Detective Swiderek identified two exhibits, one was a MySpace photograph used at trial which had a redaction at the bottom and the second was another copy of the same photograph without the redaction of the caption. The caption read, "Little Bonez Rotsk." Detective Swiderek testified that "Little Bonez" was Casillas's nickname and that the phrase in gang terminology meant that Little Bonez "rots, rots in hell. He's dead." Detective Swiderek further testified that the photograph with the caption came from Little Rowdy's MySpace page.

¶ 37    Officer Timothy Finley testified that he previously was assigned to the gang team in the 10th district, which included the area of the shooting. In March 2007, he was assigned to the 10th district. During his time on the gang team, he became familiar with gangs, primarily the Latin Kings, Two Six, Two Two Boys, and the Satan Disciples. He described the territory for the Latin Kings and the Two Six, the hand symbols used for each gang, and how to use the hand symbols

to show disrespect for a gang. He testified about the caption in the MySpace photo, "Little Bonez Rotsk." In gang context, he stated that "tsk" means "Two Six Killer" and was used by members of the Latin Kings to show disrespect to the Two Six gang.

¶ 38    The parties entered stipulations from three investigators about statements made by Gonzalez. Gonzalez told an investigator in 2009 that one guy in the van was wearing a hooded sweatshirt and the other was bald, he did not observe their faces, but the shooter had a long black gun. Gonzalez and his girlfriend were at Antonio's house two or three days after the shooting and Antonio showed them MySpace photos and were told that the people in the photographs were called "King Trouble" and "King Criminal" and were bragging about the shooting. Gonzalez stated that was when his memory came back, and he told Antonio the guys in the photographs were the ones who did the shooting. Gonzalez told another investigator in 2011 that he remembered observing the gun stick out of the vehicle and he remembered the gun "very well," but he did not get a look at the shooter. Gonzalez did not recognize the person in the MySpace photograph, but agreed to say he was the shooter because Antonio asked him, and he felt "paternalistic" towards Casillas. When he identified defendant in a lineup, he felt bad about the false identification, but he identified defendant because Antonio asked him. He identified defendant because he was a Latin King. Gonzalez told a third investigator in 2015 that Antonio told him to the tell the police that the person in the MySpace photograph was the person who shot Casillas. At first Gonzalez did not agree to do it, but Casillas's mother begged him and cried. He then agreed to do it. When he viewed the lineup, Gonzalez tried to tell the police that he did not recognize the shooter. He said the police told him he could be charged if he did not pick the same person as the individual depicted in the MySpace photo.

¶ 39    The State then rested. Defendant moved for a directed finding, which the trial court denied. In defendant's case, the parties stipulated that Detective Swiderek testified on October 26, 2011, that Antonio handed him two photographs, and that Antonio and Bahena were the only two people who could connect the nickname Little Rowdy to Oscar Flores. The defense then rested.

¶ 40    Following closing arguments, the jury found defendant guilty of the first degree murder of Casillas and that he personally discharged a firearm that proximately caused Casillas's death. The jury also found defendant guilty of the attempted murder of Medina, and aggravated battery. Defendant filed a motion for a new trial, which the trial court denied. At the sentencing hearing, the court sentenced defendant to consecutive terms of 29 years, 25 years, 20 years, and 6 years in the Illinois Department of Corrections. The trial court denied an oral motion to reconsider the sentence.

¶ 41    On direct appeal, defendant argued that (1) the State failed to proved him guilty beyond a reasonable doubt where the only evidence linking defendant to the shooting was a single unbelievable witness; (2) defendant was deprived of his rights to a fair trial and to confront and cross-examine witnesses against him when the State called codefendant Macias who refused to answer any questions; (3) defendant was deprived of his right to a fair trial by the State's introduction of prejudicial hearsay testimony; (4) defendant was deprived of his right to a fair trial based on pervasive misconduct by the prosecutors throughout trial; (5) the trial court erred in allowing the State to introduce a caption from a MySpace photo without foundation and in violation of this court's decision in *Flores I*; and (6) on remand, this court should assign this case to a different trial judge. *People v. Flores* (*Flores II*), 2019 IL App (1st) 160404-U. This court rejected defendant's claims and affirmed his conviction. *Id.* ¶ 116.

¶ 42    In March 2021, defendant filed his *pro se* postconviction petition as well as a memorandum of law in support of his petition. In his petition, defendant raised multiple claims, including that he was denied his right to a fair trial because: (1) the State was allowed to question Macias: (2) the trial court denied his request to ask the jury venire about gangs; (3) the State was allowed to repeatedly introduce the prior consistent statements of Gonzalez; (4) Gonzalez repeatedly referred to defendant's first trial; (5) the trial court allowed Detective Swiderek and Officer Finley to testify about the their belief concerning the meaning of a photo caption; (6) the State committed multiple acts of prosecutorial misconduct; (7) the trial court abused its discretion multiple times; and (8) the cumulative effect of these errors denied him a fair trial. He also asserted that his appellate counsel was ineffective for failing to raise several meritorious claims on direct appeal, that he was denied his right to confront witnesses, and that he was denied his right to a fair trial and impartial "adjudicator." In support of his claims, defendant attached multiple excerpts from the report of proceedings at trial as well as the proposed modified jury instructions to his petition. In April 2021, the trial court summarily dismissed defendant's petition in a written order and found defendant's claims were frivolous and patently without merit.

¶ 43    This appeal followed.

¶ 44    On appeal, defendant argues that the trial court erred in dismissing his postconviction petition at the first stage because he set forth the gist of a claim of ineffective assistance of appellate counsel. Specifically, he contends that his appellate counsel was arguably ineffective for failing to raise a claim that the trial court erred in refusing defendant's request to ask the potential jurors questions about their attitudes toward gangs when gang issues, including defendant's gang membership, would be introduced at trial. Defendant has not challenged the

remaining claims presented in his petition on appeal and has therefore forfeited those claims. *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal); see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 45 The Post-Conviction Act (725 ILCS 5/122-1 through 122-8 (West 2018)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2018); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001).

¶ 46 At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018). "A postconviction petition is frivolous or patently without merit when its allegations, taken as true and liberally construed, fail to present the gist of a constitutional claim." *People v. Harris*, 224 Ill. 2d 115, 126 (2007). A petition is frivolous or patently without merit only if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacks an arguable basis in law or fact if it is "based

on an indisputably meritless legal theory," such as one that is "completely contradicted by the record," or "a fanciful factual allegation," including "those which are fantastic or delusional." *Id.* at 16-17.

¶ 47    If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2018). At the dismissal stage of a postconviction proceeding, the trial court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would necessitate relief under the Act. *Coleman*, 183 Ill. 2d at 380. The circuit court is not permitted to engage in any fact-finding or credibility determinations. *Id*. at 385. We are to accept well-pleaded factual allegations of a postconviction petition and its supporting evidence as true unless they are positively rebutted by the record of the original trial proceedings. *Sanders*, 2016 IL 118123, ¶ 48. We review the summary dismissal of defendant's petition *de novo. People v. Tate*, 2012 IL 112214, ¶ 10.

¶ 48    Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 49    "The *Strickland* standard applies equally to claims of ineffective appellate counsel, and a defendant raising such a claim must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010). "Appellate counsel is not obligated to brief and argue every conceivable issue on appeal, and a defendant cannot claim prejudice based on appellate counsel's failure to raise an issue that is not meritorious." *People v. Pingelton*, 2022 IL 127680, ¶ 64. "If the underlying claim would not have succeeded on direct appeal, then 'there is no arguable legal basis' for defendant's claim of ineffective assistance of appellate counsel, and dismissal is 'proper.' " *People v. Randall*, 2021 IL App (1st) 191194, ¶ 66 (quoting *Petrenko*, 237 Ill. 2d at 501-02).

¶ 50    At the first stage of postconviction proceedings, a petition alleging ineffective assistance of counsel may not be dismissed if: (1) counsel's performance arguably fell below an objective standard of reasonableness; and (2) the petitioner was arguably prejudiced as a result. *Hodges*, 234 Ill. 2d at 17. "To adequately plead a claim of ineffective assistance of counsel, the petition must satisfy both prongs of the test." *People v. Bush*, 2022 IL App (1st) 210509, ¶ 31 (citing *Hodges*, 234 Ill. 2d at 17).

¶ 51    Here, defendant's underlying claim is that the trial court erred in denying his attorney's request for additional questions during *voir dire* regarding the prospective jurors attitudes and bias toward gangs. Prior to jury selection, defense counsel asked the court to ask the venire questions regarding whether they know people in gangs, whether they have had any interaction with gangs, whether they have strong feelings about gangs that would affect their ability to be

18

fair, whether they had ties to any community watchdog groups, and whether they had strong feelings about guns that would affect their ability to be fair. The State objected to these questions and argued that defense counsel's requested questions were not appropriate. The prosecutor contended that the appropriate question regarding gang bias was the same question used for police officers, *i.e.*, "You're going to hear evidence that there is a gang involved in this case. Would that cause you to be \*\*\* not impartial." Following this discussion, the trial court denied defendant's request and held that she would ask the standard question the same way the court would ask about the credibility of police witnesses.

¶ 52    During jury selection, the court asked the prospective jurors whether they would be able to give each witness who testifies the same weight, level of credibility, regardless of if they are a police officer, alleged gang member, or any other witness. Defendant argues that the court's failure to ask the additional questions about gang-related prejudices was an error because this evidence was integral to the trial.

¶ 53    *Voir dire* examination is to assure the selection of an impartial jury; it is not to be used as a means of indoctrinating a jury or impaneling a jury with a particular predisposition. *People v. Bowel*, 111 Ill. 2d 58, 64 (1986). Stated another way, the purpose of *voir dire* "is to obtain enough information about the beliefs and opinions of potential jurors as would allow for the removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed by the trial court." *People v. Sanders*, 238 Ill. 2d 391, 400 (2010) (citing *People v. Strain*, 194 Ill. 2d 467, 476-77 (2000)).

¶ 54    "[T]he trial court is given the primary responsibility of conducting the *voir dire* examination, and the extent and scope of the examination rests within its discretion." *Strain*, 194 Ill. 2d at 476. "However, the trial court should exercise its discretion in a manner that is

consistent with the goals of *voir dire*. *Voir dire* is conducted to assure the selection of an impartial jury, free from bias or prejudice, and grant counsel an intelligent basis on which to exercise peremptory challenges." *People v. Dixon*, 382 Ill. App. 3d 233, 243 (2008). " 'To be constitutionally compelled, it is not enough that a *voir dire* question be helpful; rather, the trial court's failure to ask the question must render the defendant's proceedings fundamentally unfair.' " *People v. Encalado*, 2018 IL 122059, ¶ 25 (quoting *People v. Terrell*, 185 Ill. 2d 467, 485 (1998)).

¶ 55 In *Strain*, the supreme court held that when testimony pertaining to gang membership and gang-related activity was an integral part of the defendant's trial, the defendant must be afforded an opportunity to question prospective jurors concerning any gang bias. *Strain*, 194 Ill. 2d at 477. In that case, the defendant was charged with first-degree murder. The State's theory was that the defendant, a gang member, shot the victim while attempting to retaliate against a rival gang for allegedly shooting the defendant in the leg on an earlier occasion. *Id*. at 470. Prior to the start of *voir dire*, the trial court stated that it would ask prospective jurors about their involvement, if any, with gangs. *Id*.

¶ 56 During *voir dire*, the trial court asked potential jurors if they, any member of their family, or a close friend had any involvement with a gang. The court also asked each prospective juror whether he or she could be fair to both sides. However, the court refused defense counsel's request to ask each prospective juror whether the juror would find the defendant less believable if the juror learned that the defendant belonged to a gang. *Id*. at 470-72. At trial, the State introduced the defendant's alleged statement into evidence, as well as the testimony of several police officers and members of a rival gang in support of its theory that the defendant shot and killed the victim in an attempt for revenge against a rival gang. *Id*. at 473.

¶ 57    As the supreme court acknowledged, gang information permeated the testimony of almost every witness at the defendant's trial and the outcome of the trial turned upon the credibility of the defendant, the testifying police officers, and rival gang members. *Id.* The *Strain* court acknowledged that "street gangs are regarded with considerable disfavor by other segments of our society" and "there may be strong prejudice against street gangs." *Id*. at 477. In considering the prejudicial effect of bias against gangs, the court held that "when testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, the defendant must be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court, concerning gang bias." *Id*.

¶ 58    Following this holding, the supreme court in *Strain* concluded that the trial court erred in denying the defendant's request to question the venire regarding gang bias and "defendant was denied an informed and intelligent basis on which to assert challenges for cause or to exercise peremptory challenges." *Id.* at 481.

¶ 59    Defendant contends that the trial court's question asking if the prospective jurors could give each witness, including police officers and alleged gang members, the same level of credibility was not sufficient under *Strain*. According to defendant, this question "failed to adequately probe whether the jurors would be prejudiced by evidence" that defendant and some witnesses were "gang members and lived a gang lifestyle." We disagree.

¶ 60    The requested question in *Strain* sought to ask whether the prospective jurors would find the defendant less credible based on his alleged gang membership. *Id*. at 471. In this case, the trial court essentially asked each prospective juror whether they would judge the credibility of a gang member as they would judge the credibility of any other witness. Contrary to defendant's contention, *Strain* did not hold that a trial court is required to ask the venire multiple questions

about their knowledge and involvement with gangs. *Strain* did not establish such a rule; rather, the supreme court held that the defendant must be afforded an opportunity to question prospective jurors about gang bias. *Id*. at 481. The trial court in this case complied with *Strain* by asking the prospective jurors about their ability to weigh the credibility of witnesses involved in gangs the same way they would any other witnesses who testified.

¶ 61    Further, we point out that the questions sought by defense counsel relating to gang involvement were similar to those asked in *Strain* but found insufficient to determine bias. "A juror might well answer a question regarding gang involvement in the negative, while harboring an opinion of gang members that would affect his ability to weigh the evidence fairly and impartially." *Strain*, 194 Ill. 2d at 474; see also *People v. Gardner*, 348 Ill. App. 3d 479, 482, 486 (2004) (observing that *Strain* held "gang bias does not depend on one's involvement with gangs"). The supreme court later explained its holding in *Strain*:

> "The *voir dire* questions in *Strain* were not required because gang members feel ashamed of being in a gang, or simply because gang membership provokes strong feelings in the public. Instead, the questions were required because the public views the testimony of gang members with skepticism and may, therefore, fail to consider the testimony of a gang member without prejudice." *People v. Encalado*, 2018 IL 122059, ¶ 30 (declining to extend the holding in *Strain* to *voir dire* questions about a bias against prostitution).

Defendant has not cited any cases extending *Strain* to find an abuse of discretion for failing to ask additional questions during *voir dire* about gang involvement as sufficient to elicit a bias. Under *Strain*, the trial court was required to ask the venire a question about any bias against the testimony of gang members and the court complied. Since the trial court properly questioned the

venire about gang bias, the court did not err in denying defense counsel's requested jury questions.

¶ 62    Since we have concluded that defendant's underlying issue lacks merit, defendant cannot show that he was arguably prejudiced by counsel's failure to raise this claim on appeal. *People v. Easley*, 192 Ill. 2d 307, 329 (2000). Accordingly, defendant's claim of ineffective assistance of appellate counsel fails and the trial court properly dismissed defendant's postconviction petition at the first stage.

¶ 63    For the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 64    Affirmed.